At this time we'll hear Zilgme v. United States. Michael Willett for the Plaintiff Richard Zilgme. We're asking the court to reinstate the complaint here. Basically there's two issues. The first one I wanted to talk about was the question of notice of the loose bolt on the loading deck. And it's our contention that this falls into the class of cases where there's a recurring dangerous condition of the bolt. And the case is really about drawing the line between general awareness and a recurring dangerous condition. And we think it's a recurring dangerous condition for a few different reasons. One of which is that the area involved is restricted to the loading decks. It's a very specific identifiable area. The second is that it's a very specific identifiable problem. And that would be the bolts becoming loose. And the third is that this problem comes about because of the purposeful activity of the defendant. This isn't like the debris in the parking lot cases where you have a large area and the dangerous condition results from the actions of random members of the public. This is something that comes about because of the defendant's own activities in using forklift traffic to carry the pallets of mail out to the tractor trailers like Mr. Zilgme was. It's a recurring condition? Does that mean that the defendant, post office, had constructive notice? Yes. The law is, it's generally recognized in New York, is that if it's a recurring dangerous condition, then the defendant is deemed to have notice of each recurrence of the condition. Because they know that this happens. But if it occurs and they've had a . . . well, the fact that it occurs doesn't make them liable. The question is how long, what period of time has it passed before they should have known about it? It's like slip and fall cases in grocery stores. Grocery stores know that people are going to drop stuff in the aisle and people then could come along and slip. That's why sweep logs become so important in those grocery store cases to show that the grocer is regularly patrolling the aisles to be aware of the fact that that dangerous condition can exist. The same is true here. The bolts aren't always loose. The question is, the bolts occasionally come loose because, your allegation is, the forklift strikes the plate, loosens the plate, loosens the bolt, and the bolt can come up and become an obstruction, right? Yes, Your Honor. And one of the requirements to establish notice is this has to be a condition that is normally left unaddressed by the defendant. Wasn't there in the record proof that they were regularly inspected? Well, there's proof in the record that there's an affidavit or a declaration from Mr. Bahoon that says that they inspected these on a quarterly basis. And our contention would be that this isn't like, that's not enough. That's not enough. How do you measure that? What standard do you employ? What do you give to the court to say to the court, that's unreasonable? Is there some standard in the industry or something like that? I don't think there's anything in the record about a standard in the industry. But I would contrast what's done here with what has been established in the cases where courts have found that it wasn't left unaddressed. And I'm talking about the cases where there were daily, like what Your Honor talked about, like a daily sweep of the store. We had cases where there was hangers left on the floor of the Walmart or something like that. They did a sweep every day. And our position is that once a quarter is not enough to do this. How high up was this bolt projecting? The testimony of Mr. Zilme was that it was about an inch and a half or two inches high. Mr. Hila also testified that he saw the loose bolt, observed it after the accident. But he didn't give a measure of how much it was. Judge Scott found that there was an issue of fact as to whether that was a dangerous condition as opposed to a trivial issue. That's why he denied summary judgment on that issue. On that issue. But getting back to Judge Wesley's question, there's two aspects. One, we're saying that quarterly is not enough because you get forklifts going through there every day. A jury should at least, or a fact finder should at least have the opportunity to address the reasonableness of that. And- I didn't mean to interrupt you, but a jury's got to measure that against something. There are standards in industry. There are engineering things. That's the thing that troubled me about your papers was that, like in the sweep log things, you have data that tells you how often spills occur and stuff like that. Whenever I'm in Wegmans, I always see the guy going around and doing the little radio or the little computer check that he's covered the area. But I guess what troubles me is that you think you've got an issue of fact to go to the jury saying, well, it's unreasonable for them to look at it only a quarter of a year. How many reports were there of loose bolts over a five year period, do you know? I don't know, Your Honor. It's not in the record. That's not in the record. Did you ask for it? I don't know whether that was asked for, Your Honor. Wouldn't that be important for you to establish that this was a regularly occurring matter such that they should be looking on a regular basis for it? I think that that would be helpful. If it occurred every month, you'd say that quarterly's not enough, right? Yes, but you do have the email of Mr. Bahoon that says that this is a common occurrence, that this regularly occurs. Well, I understand that, but so you think that's enough for the jury? Yes, because I think that the defendant hasn't eliminated the issue of fact. And the other thing that I would point to the court's attention is that Mr. Bahoon says in his declaration that these maintenance, part of the quarterly maintenance process involved checking the bolts. If you look in the record at page 346, I think it is. It's the emails, the emails between Mr. Bahoon and the district manager, a woman named Kathleen Burns. One of the questions that Kathleen Burns directed to Mr. Bahoon was, is checking the bolts part of the PM, the preventive maintenance. And his answer is, it's not part of the preventive maintenance. So I think you've got a contradiction in the record from the defendant's representative as to whether they were actually doing that. Argue that to Judge Arcaro? I don't think that was argued to Judge Arcaro, Your Honor. I can't say it. It is in the- I think they argue it here, but we're judging whether Judge Arcaro made a wrong determination. You can't now tell us, you gotta stay with what you argued to Judge Arcaro. I understand, Your Honor. I'm just pointing out that that's in the record. But even aside from that- But that doesn't do you any good. No, but even aside from that, I think that the defendant did not eliminate the issue. And I would just- Did you depose the fellow who said that these things are common? No, he was not. Why not? I can't, Your Honor, I wasn't handling the discovery. I can't answer that. I can't hear you. I can't answer that question, Your Honor.  I did not have the case at the time. Okay, so we don't know what the bolts being loose commonly or is common means in terms of whether it happens once a year or, I mean, if you'd been there ten years. I'm just trying to get a sense that the quarterly's not enough. And if it's common, he says, yeah, it's happened four times in the last ten years. Then quarterly seems a lot more reasonable, doesn't it? Yes, but again, I would say that it's the defendant who has to eliminate this issue. In fact, the forklifts go by every day. This is whether you can make out your claim that they breached a duty. And the duty is that they should regularly inspect their loading area because there's a dangerous condition that they helped create and therefore should be aware of, right? That's what the law is. Yes, Your Honor. And I think the admission that this was a common occurrence because of what happens with these forklifts. So that they have to go is enough to get us over the hurdle. Summary judgment. I just want to follow up on Judge Wesley's questions. I'm turning to page 346, to which you directed us before. So Kathleen Burns, who is the supervisor, I assume, asks Mr. Bahoon, were the bolts and bolts added locally at 10 PM, I assume that's the daily check that goes on, is that right? I believe that's the quarterly check, Your Honor. And he writes back that we don't check them. These bolts were added locally, they're not checked regularly. Is there any follow up from Kathleen Burns after that? There is nothing else in the record, Your Honor, other than Mr. Bahoon's declaration. He asked if that checked, and he says it does not require the checking of bolts PM, and she doesn't respond to that. I'm not aware of any response, Your Honor. Okay, thank you. Just, Your Honor, I know I'm over my time. There was another issue as to whether the construction of Dock 38, where the bolts were a little bit higher than they were at Dock 37, is in itself a dangerous condition. They were sunk into the plate, and they were higher on 38. You brought it up with Judge Jacob's permission. I'd like to ask you, did you have any kind of standard from an engineer or anything that said that in areas where there's regular traffic that a raised bolt constitutes a hazard or violated some kind of building code? I mean, normally when I used to see these things, there'd be an engineer or an architect or somebody would put in an affidavit saying, in common areas, tripping hazards are a great concern, and so therefore any kind of raised object presents a hazard. And sometimes they're even building codes. I realize this is a federal post office, so there may have been certain local exceptions. But something that would create a standard of care. There is no proof of that sort in the record, Your Honor. But I would rely on the Hutchinson case and the cases from the trincere from the Court of Appeals, where you look at all of the facts. And yes, it's a small elevation, but it is an elevation, and it's different from the dock where he usually worked. And he's working in a situation where his attention is distracted, because as he's walking forward, what's he doing? He's looking up in the air to grab the door, the strap where you close the trailer door. So his attention is elsewhere. It's not a situation where you would be inclined to look down. So that's why in the particular circumstances of this case, we would argue that there's an issue of fact as to whether that's an unreasonably dangerous- Isn't it true that the district court did not address the issue of raised bolts at all? The district court addressed it only with respect to the loose bolt that Mr. Zilgley saw up in the air. Not with regard to the construction in general of 38 where the bolts weren't quite flush. Thank you. Right. Thank you, Your Honors. Good morning, Your Honors. My name is Mary Pat Fleming. May it please the court and I represent the defendant Appelli, United States of America in this case. It is our position that the district court decision should be affirmed, granting the summary judgment motion of the defendant for a whole host of reasons. Unfortunately, Mr. Zilgley fell on the loading dock, but that was not an accident that the postal service could have prevented or had notice of. Number one- There was a raised bolt, didn't you? That's what the exchange between Kathleen Burns and John Mahoon established. No, Your Honor. There was no notice of a raised bolt. The postal service, there was no report of any accidents on loading dock 38 where this accident occurred. There was no- The government was aware that these bolts come loose, so they were aware of a potential for loose bolts. Correct, Your Honor. Indeed, they bothered a different loading dock to bury the bolt down below the level of the ground into some kind of an indentation. Well, I would contend, Your Honor, that the differences between loading dock 37, where Mr. Zilgley worked normally, and loading dock 38 were minimal. And there has been- As to this point, they were not minimal. Because in one, the bolts project, and the other, the bolts are sunken. I would disagree that the bolts are sunken, Your Honor, in loading dock number 37. And the undisputed proof, Your Honor, is that the bolts are less than one quarter of an inch raised on loading dock number 38. What's the need to be a danger to someone working there? A quarter of an inch? I mean, if you trip over a quarter of an inch, you've tripped. Doesn't make a difference if it's more or less. Your Honor, I think it's unclear as to what happened here. Mr. Zilgley has claimed many different reasons why he fell. At first, he claimed that he fell on a wet spot and a bolt that was sticking up. Then he claimed he fell on a loose bolt. Finally, he claimed that he fell as a result of the difference in configuration between loading dock number 37 and loading dock number 38. Go ahead, finish your answer. And it is my contention that for that reason alone, he can't even tell us, the court, as to what caused him to fall. And that's a failure in proof. The theory, it seems to me, in front of magistrates, Scott wasn't about a quarter inch bolt at all, it was about an inch and a half bolt. There was no argument about this quarter inch bolt at all. This is something that comes up in front of our carers. So I don't understand how the quarter inch is really even in the mix here. And I mean, the quarter inch is about the size of that eraser. Correct. And the court of appeals, the New York court of appeals, has said that defects that are so trivial or slight that a prudent and reasonable person would be able to see them and navigate them are, as a matter of law, not actionable. And that's- But the question, and a half an inch, but the problem I have with all this discussion about a quarter inch is, I don't understand, I don't think that was the theory in front of the magistrate. That was something that came after the fact in front of Judge Arcara. It was raised during, in opposition, I think, to our motion. And in the objections, I think the plaintiff. It's buried within the configuration language. There's some issue within that. In front of the magistrate? It was raised in front of the R&R, wasn't it? I think there was some allegation. I mean, the main allegation was this lack of an extender plate. But in that argument that Mr. Zilgamy makes, there is some allegation of a raised bolt, which is one quarter inch. Not in front of the magistrate. I don't recall, Your Honor. I know it was part of the objections. Well, I know that it was raised in front of Judge Arcara, but I was having a hard time. Your opponent will get up on rebuttal and tell me, I'm sure. I'm hoping he will. But I don't recall it being raised in front of Judge Scott. Which is the odd thing, because Scott is really focusing on an inch and a half. And he says, well, an inch and a half makes some sense to me, that that's observable. But by the same token, if someone's pushing something, it's also a far more substantial hazard. Well, and I don't mean to interrupt, but there's no proof that, I mean, there's certainly no proof that that bolt was raised an inch and a half before he fell. I mean, there's no proof. The proof in the record is that Mr. Zilgamy, after he fell, he stubbed his right foot into something. After he fell, he looked back and he thought he saw something sticking up that was about an inch and a half to two inches. And he prepared, another reason why we really don't know what happened, is he prepared a replica bolt, which looks nothing like any bolt on the loading docks. Number one through 46, or loading dock number 38, the main post office. Which is another question as to what really caused Mr. Zilgamy's fall. The post office had knowledge that one of the recurring difficulties was that these bolts became loose, right? You knew that. But with all due respect, your honor, the postal service is inspecting the loading docks daily. The postal service is inspecting the- One moment. Exchange of emails proves they don't do this daily. They don't check for the bolts daily. That's what the exchange between Kathleen Burns and John Mahoon establishes. Are these checked during the PM? And he says, does not require checking of bolts. Well, there is some conflicting evidence, because Mr. Bayham in the second, in the record on page 347, he indicates that bolts are checked and discovered either from notice or through inspection. So there is some conflicting evidence. But your honor, the post- Sounds to me like a question of fact. Is it a question of fact? Facts to the left of me, facts to the right of me? Isn't that a question of fact? I would disagree, your honor. Well, you just said there's a conflict in the record. The postal service is, as discussed during the appellant's presentation, the postal service is doing its best to detect hazards. The postal service cannot detect something that is not visible. And it is our contention that the- But I didn't believe that it was visible. No, I think the contention was that occasionally the bolts become loose. The problem is, there was nobody saw this loose bolt. The postal service is not required to be clairvoyant. It was not visible and apparent. If the bolt was loose, it could have gone. I mean, the theory was that he caught his toe on the bolt and it pulled up and he fell. That's his theory. And he says he saw it, what he's laying there, he looks back and he sees the bolt up. Now, if the bolt can come up, the bolt can go down. Now, is there someone who inspected the bolt right after the accident? And what was their testimony? Yeah, so Mr. Bahan did not, he was the safety employee of the postal service. And he, the next morning, well, actually that morning, around in the morning, 10 o'clock or so. He went to loading dock number 38 to see what caused the fall. And he didn't see anything. He didn't see anything. The loading dock looked perfectly normal. But did he grab a hold of that particular bolt and try and raise it? So then what happened was he went back, Your Honor. And he was instructed, Mr. Zildjian may have fallen as a result of a loose bolt. So at that point in time, he, or an employee he was with, actually went down and checked the bolts with their fingers. And it took one employee prying the bolt with his fingers to discover that there was a loose bolt. We don't even know if that was the loose bolt. But there was discovered afterwards. Lastly, there was an email, one of the emails says that because of the use of the forklifts in the area, that these bolts becoming loose is not uncommon, or is common. Was common ever defined, or was that person's deposition ever taken? No, Mr. Bahan was not deposed. How long did Mr. Bahan work for the post office? I'm not sure, Your Honor. I don't know if it was in his declaration. I think he has been a long time employee, because he is the supervisor involved in safety issues. So I think he's been a long time postal employee. So I think recurring condition doesn't apply here, because I don't think the postal service can be required to correct something that it had no awareness of. I knew it was a recurring condition, because I think the very person you're talking about, Mr. Bahun, said it was recurring because of the work of the forklifts. But that's more of a, yeah. Did you specifically say it recurs often? But it has to be a recurring condition of a dangerous condition. There's been no proof that anybody's ever fallen as a result of a loose bolt. There's been no complaints. It's not safe to walk across a surface that is uneven and that has impediments in it. You don't have to be an expert. But with all due respect, loading decks of necessity have to have uneven surfaces. And Mr. Zilgme was well aware of that, because he had worked for the Maine Post Office, so it's our contention that a loading deck cannot have a flat surface. It does, of necessity, have to have some little bumps, minor bumps. It doesn't have to have a bolt protruding one and a half inches. It's, I would, there is no proof, Your Honor, that that bolt was protruding one and a half inches. In fact, the proof is much to the contrary, that despite daily, weekly, quarterly, there is no proof. Mr. Hila testified there is no way that that bolt was sticking up an inch and a half when Mr. Zilgme was working before that. So you know that, I'm just going to read the sentence from Mr. Bahoon's email on page 347. He says, bolts become unanchored by fork blades hitting them and is a fairly common occurrence. That is part of the record. That is part of the record, Your Honor. So I don't know why that doesn't lead to constructive notice that the bolts have to be checked. Because it doesn't lead to constructive notice because there was no way that that loose bolt was visible and apparent. It was not apparent and visible and did not, there's no proof in the record that it existed for a sufficient period of time such that the postal service could have remedied it or fixed it or repaired it, Your Honor. So there's no proof of constructive notice. And again, the postal service is inspecting these loading decks, very concerned about safety, daily, weekly, quarterly. But they don't look at the bolts. That's what the email is between Burns and Bahoon. They don't look at the bolts PM. I think, well, I think it's unclear as to, the proof with respect to the quarterly inspections is a little unclear as to whether the bolts are looked at or not. But it is our contention that there are two documents that say that they are looked at. They're not really a problem in the sense that they're a maintenance issue. They impede the delivery of mail, but there's been no proof that loose bolts have been a problem with respect to accidents and people getting hurt, this is not the situation where you have a thing of salad dressing on the floor. Well, if you have salad dressing on the floor, there may be people who have slipped on it. But if you know there's salad dressing on the floor and nobody slipped on it before, that does not mean that it's not as dangerous a condition, right? But again, I agree. It could, if you have a loose bolt, it could potentially be dangerous. But we also have to be able to detect it. And that there is no proof that this loose bolt or raised bolt was visible and apparent. And the postal service cannot be, that's not the standard. They are not required to anticipate that a bolt that is not visibly defective. Is going to pop up. Exactly. Thank you. Thank you, your honor. Just briefly, your honors, the question was raised as to whether this was the issue of the bolts not being flushed was raised at the district court in front of Judge Scott. My reference is to the memorandum of law, which the memorandum of law document, docket number 32-5, shows that the argument was made as to the whole construction of that. Pages it in the- It's not in this record, your honor, because it's a memorandum of law. So it's in the docket. Was it in your complaint that it was a defect, just the existence of the bolt itself? In the complaint, your honor? Yeah. I believe it is, your honor. Okay, well I'll look for it. Don't use your time up. Okay. I'll look for it. I personally don't think it's there, but I'll look again. Okay, and I can't, I'm not going to swear under oath that it's there either, your honor. The claim is a lot better at an inch and a half than at a quarter inch. Yes, I know it is. Okay. But just, but the claim is made, and it was the overall construction. It's six times better at an inch and a half than it is at a quarter inch. It is, your honor, but we leave no claim unclaimed. But the other point on that is it is in the memorandum of law that this construction, and yes, it referred to the number of bolts, the height of the bolts, all of those things. It's in there. And that's why in the record, I can actually point to the record, beginning at page 336, there are a series of photographs which contrast the two loading docks, 38 and 37. So if you compare 338 with 343, you'll get a very good view of the difference between the way the bolts appeared on the two different loading docks. Unless there are further questions. Thank you, your honors. Thank you both. I have to ask you, is Mr. McGaskill still alive? No, no, Mr. McGaskill is deceased, your honor, as is Mr. Gibson. I tried a long malpractice trial with him 35 years ago. Actually, your honor, we just celebrated the 30th anniversary of the founding of the firm, and Mr. Crosby gave a nice speech in which he had many nice things to say about Mr. McGaskill. Fine man. Safe journey home to both of you. Thank you, your honors. Thank you. We'll reserve decision.